John **BRINICH, d/b/a Brinich Builders, Appellee,**

v.

**Timothy JENCKA and Rachel Jencka, his wife Appellant,**

v.

**Julie L. Brinich and Christine A. Meliza, Appellee.**

Superior Court of Pennsylvania.

Argued June 28, 2000.

Filed July 28, 2000.

Jeffrey T. Olup, Charleroi, for appellants.

Dara A. DeCourcy, Pittsburgh, for John Brinich.

Before: JOHNSON, JOYCE, and MONTEMURO *, JJ.

MONTEMURO, J.:

¶ 1 This is an appeal from the judgment entered March 16, 1999 in the Washington County Court of Common Pleas in favor of Appellee, John Brinich d/b/a Brinich Builders, and against Appellants, Timothy and Rachel Jencka, for breach of contract, defamation and unjust enrichment. For the reasons set forth below, we affirm.

¶ 2 In July 1993, the Jenckas met with Brinich to discuss construction of their new home.[1] The Jenckas had previously purchased land and obtained architectural plans for the design. After several meetings that summer, the parties finally agreed on a contract price of $173,000.[2]

The parties signed an agreement, dated August 10, 1993, which provided for the work to be "substantially completed" by December 31. (Complaint, Exhibit A, Agreement, dated 8/10/93, at Article II).

¶ 3 The Jenckas' first application for a construction loan, with Mortgage Network Corporation, was denied. They subsequently submitted an application to Integra Bank which ultimately approved the loan after the construction price was once again reduced, this time to $170,000; closing occurred on October 8, 1993. The resulting Construction Loan Agreement (CLA), signed by all the parties, provided for improvements to be completed within 270 days of the date of the Agreement, and specifically "supersede[d] any other completion date that may appear in the Contract Documents[,]" including the parties' August 10 th Agreement.[3] (Complaint, Exhibit B, CLA, dated 10/8/93, at ¶ 2). At closing, Brinich was informed that he could not break ground until he received written notice from Integra.

¶ 4 Despite the delay in securing a construction loan and the revised completion date listed in the CLA, the Jenckas contend that Brinich assured them that the house would be completed by December 31, 1993. Mr. Jencka testified that time was of the essence as his wife was expecting their first child in February, 1994; he claims they informed Brinich that they wanted to be in their house by the time the baby was born. Brinich, however, contends that although the parties did discuss completing the home in five months when they first met in July, he never promised that the house could still be completed by December 31 st when closing did not occur

---

* Retired Justice assigned to Superior Court.

1. Brinich formed a sole proprietorship, Brinich Builders, in late 1992. The Jenckas' home was his first major project as a general contractor.

2. The parties' testimony starkly contrasts as to how they arrived at this price. Mr. Jencka contends that the originally quoted price was $132,000, to which the parties added various

appliance and fixture allowances to arrive at $173,000. Brinich, however, testified that his original estimate was $200,000, which was reduced after Jenckas told him they wanted to spend no more than $50 per square foot.

3. The CLA incorporates all the contract documents including the architectural drawing and specifications.

until October, and that the Jenckas never insisted on being in the house by February, 1994.

¶ 5 Brinich received written approval to begin construction on October 13th or 14th. However, the excavator was behind schedule and unable to break ground on the Jencka lot until November 3rd. Over the next 8 months, Brinich encountered numerous problems which impeded his ability to complete construction in a timely manner. First, shortly after the trenching began, the excavator encountered an underground spring that continually filled the foundation with water. To correct the problem, Brinich had to extend the foundation and install a sump pump. In the meantime, the blocklayer with whom Brinich subcontracted for the job began work on another project; therefore, Brinich was forced to find a replacement at a higher price. In January 1994, construction was delayed by extremely cold weather.

¶ 6 In addition to these problems, Brinich testified that the Jenckas continually requested additions and/or modifications to the home. These changes not only involved additional costs, but also delayed construction.[4] Although Brinich testified that these changes were requested and approved by the Jenckas, Mr. Jencka claims that he was unaware they would result in additional costs; indeed, he believed some of the modifications would actually result in cost savings.[5] Only one addition, an extension to the garage, was covered by a written agreement signed by the parties. It is undisputed that none of the modifications were submitted to Integra in writing as required by the CLA, see CLA at ¶ 4, and, with one exception, Brinich failed to invoice the Jenckas for these modifications at the time they were completed.[6]

¶ 7 Construction continued into the spring of 1994. Brinich testified that he found notes from the Jenckas almost every morning on the job site requesting he change or move something, or inquiring why a project was not complete.[7] Brinich received the first three draws in early 1994. Draw # 4 for $34,000 was due to be paid in May. The parties submitted a Request for Payment which instructed Integra to supply two checks, one to the Jenckas for $11,631,69 "for monies [they] disbursed for lighting & appliances (plumbing,)" and one to Brinich for the remaining $22,368.31.[8] (Answer to

4. We note that under the CLA, Brinich received payment disbursements, or draws, at certain, pre-determined times during construction, i.e., after completion of the foundation, after completion of the framing, etc. See Complaint, Exhibit B, Disbursement Schedule. At the appropriate time, all parties were required to sign and submit a request for payment. Brinich, therefore, was required to pay for labor and materials up front, but was eventually reimbursed when he received a draw. Because of the additional work he was performing at the request of the Jenckas, Brinich was forced to borrow substantial amounts of money from his mother-in-law, and had trouble paying his subcontractors.

5. Brinich claims that the Jenckas requested the following modifications: a garage addition; an additional powder room; a stone fireplace in the family room; a closet in the garage; a larger front door; a third skylight; a deck layout revised to include an octagon; medicine cabinet installation; changes in the window and exterior brickwork; additional electrical wiring; a basement fireplace and bathroom; a finished third floor; and site fill and finish to grade. See N.T., 9/14–25/98, at 583–84. In addition, Brinich claims he credited the Jenckas for other changes, i.e., the substitution of 25 year shingles for 30 year shingles.

6. In April 1994, Birnich submitted an invoice to the Jenckas for additional framing costs. The Jenckas paid Brinich directly.

7. One of Brinich's subcontractors, Todd Lesnett, testified that "there were always notes of changing or adding, taking one piece of molding and putting another piece of molding in; replacing something[,]" (N.T., 9/14–25/98, at 135), and that this delayed construction. (Id. at 136). In addition, the plumbing contractor, Daniel Yoest, also noticed "lots of notes," but paid no attention to them because they generally did not pertain to the plumbing. (Id. at 154).

8. The contract included a $3200 allowance for lighting fixtures. Because Mr. Jencka

Amended Complaint, New Matter and Counterclaim Filed on Behalf of the Jenckas, Exhibit 3, Request for Payment). Although Brinich disputed this payment, he testified that he felt compelled to sign the disbursement request because "[i]f I didn't sign this and send it to [Integra], I wasn't getting any check.... I'll take $22,000.00 over nothing any day of the week." (N.T., 9/14–25/98, at 779).

¶ 8 As the deadline under the CLA approached, the parties realized that the house would not be completed on time. Therefore, on June 29, 1994, with the approval of Integra, the parties executed an agreement extending the time for completion of the home until July 21, 1994. *See* Answer to Amended Complaint, New Matter and Counterclaim Filed on Behalf of the Jenckas, Exhibit 5, Agreement, dated 6/29/94. Attached to the Agreement was a list of uncompleted projects. The Agreement also contained a liquidated damages clause in the event that construction was not completed by the extension deadline.

¶ 9 In late July, Brinich and his family took a week-long vacation. Brinich testified that he left work for his laborers to do during that time and called almost every day. When he returned, however, he learned that his subcontractors had been told by Mr. Jencka to leave the job site because they were not going to be paid.

¶ 10 In early August, at a meeting with the Jenckas to discuss the progress of construction, Brinich explained that he was quickly running out of money because of the many additions and modifications the

Jenckas had requested. By the end of September, construction was still not complete and Brinich was completely out of funds. Although he still intended to finish construction, the Jenckas refused to allow Brinich on the property after they obtained an occupancy permit and moved into the house in early October.[9] In addition, the Jenckas refused to authorize disbursement of the final $25,500 draw.

¶ 11 Brinich commenced suit against the Jenckas on December 22, 1994. An Amended Complaint, alleging breach of written and oral contracts, unjust enrichment, tortious interference with contractual relations, and defamation, was filed on May 18, 1995. The Jenckas subsequently filed an Answer and Counterclaim alleging breach of contract, misappropriation of funds and conversion. On June 20, 1995, they praeciped to join as additional defendants Brinich's wife, Julie, and Brinich's mother-in-law, Christine Meliza, against whom the subsequent Complaint alleged conversion and civil conspiracy.[10]

¶ 12 Following a two-week trial, the jury returned a verdict in favor of Brinich and against the Jenckas in the amount of $87,635.21 for breach of written and oral contract, and against Mr. Jencka only in the amount of $33,000 on the defamation count.[11] The jury also found for Brinich and against the Jenckas on all of the Jenckas' counterclaims.[12]

¶ 13 The Jenckas filed timely post-trial motions which were denied by Order dated March 9, 1999.[13] Judgment was subse-

purchased the fixtures himself, as well as additional plumbing fixtures and appliances, Brinich gave Jencka a check for $3000 in April 1994.

9. Brinich did return once in mid-October to retrieve some tools he had left at the job site.

10. Mrs. Brinich and Meliza were each signatory to one of Brinich's two business checking accounts.

11. Specifically, the jury awarded $35,000 for breach of written contract and $52,625.21 for breach of oral contract. The jury also found

for Brinich on the unjust enrichment count, but awarded no damages. The trial court granted a nonsuit on Brinich's claim for tortious interference with contractual relations.

12. At the close of the Jenckas' case in chief, the trial court granted a nonsuit on the Jenckas' third party complaint and their counterclaim against Brinich for misappropriation of funds.

13. Brinich's post trial motion to mold the verdict to include interest was granted by Order dated March 11, 1999. Judgment on

quently entered on the verdict on March 16, 1999, and this appeal followed.[14]

¶ 14 The Jenckas now raise six allegations of trial court error for our review:

1) the court erred in failing to grant a new trial when it excluded the testimony of two defense witnesses;

2) the court erred in failing to grant judgment notwithstanding the verdict (JNOV), a new trial, or a remittitur on Brinich's defamation claim;

3) the court erred in failing to grant JNOV or a new trial on Brinich's breach of written contract claim;

4) the court erred in failing to grant JNOV, a new trial, or a remittitur on Brinich's breach of oral contract claim;

5) the court erred in failing to grant JNOV or a new trial on the Jenckas' liquidated damages claim; and

6) the court erred in failing to remove a nonsuit or grant a new trial on the Jenckas' claim against Brinich for misappropriation of funds and their third party claims for conversion and civil conspiracy.

*See* Jenckas' Brief at 3.[15]

■■■ ¶ 15 Because many of the Jenckas' claims involve the trial court's denial of a new trial and/or JNOV, we first outline our standards of review. The decision whether to grant a new trial lies within the trial court's discretion. *Martin v. Evans*, 551 Pa. 496, 501–02, 711 A.2d 458, 461 (1998). Therefore, when reviewing an order denying a motion for a new trial, we must determine whether the trial court "clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case." *Whyte v.*

*Robinson*, 421 Pa.Super. 33, 617 A.2d 380, 382 (1992). "A new trial is warranted when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice." *Martin*, 551 Pa. at 501, 711 A.2d at 461. Conversely, JNOV may be entered if, after considering only the evidence supporting the verdict and giving the verdict winner the benefit of the doubt, the trial court clearly finds that the movant is entitled to judgment as a matter of law, and the evidence presented at trial was such that no two reasonable minds could disagree that the verdict should be in favor of the movant. *Degenhardt v. Dillon Co.*, 543 Pa. 146, 153, 669 A.2d 946, 950 (1996). Finally, we note that credibility determinations are for the jury, which "is entitled to believe all, part, or none of the evidence presented." *Randt v. Abex Corp.*, 448 Pa.Super. 224, 671 A.2d 228, 233 (1996).

■■■ ¶ 16 The Jenckas first contend that the trial court erred in excluding the testimony of two witnesses, William Brinich and George Gilbert, regarding the past business practices of John Brinich. Questions concerning the admissibility of evidence are within the discretion of the trial judge, whose decision we will not overturn absent an abuse of discretion or an error of law. *Southard v. Temple University Hosp.*, 731 A.2d 603, 615 (Pa.Super.1999). An evidentiary ruling that is erroneous, as well as harmful to the complaining party, may be the basis for a new trial. *Id.*

■■■ ¶ 17 During their case-in-chief, the Jenckas offered the testimony of William Brinich, John Brinich's uncle, for whom Brinich worked in the mid to late 1980's.

---

the molded verdict against the Jenckas, jointly and severally, in the amount of $107,871.09, and against Mr. Jencka only in the amount of $33,000 was entered by Order dated March 23, 1999.

14. We note that the Jenckas originally filed an application for stay pending appeal which was granted by this Court. On June 30, 1999, we dismissed the appeal without prejudice

because the Jenckas had initiated bankruptcy proceedings. When their Chapter 7 action was dismissed *via* consent, the Jenckas petitioned to reinstate their appeal and stay, which was granted on December 9, 1999.

15. We have reorganized and consolidated the Jenckas' issues on appeal.

Counsel described William Brinich's proposed testimony to be that John Brinich "was using his [William's] address and information to do his [John's] business" and that "there were certain instances of business misconduct here that William Brinich knows about." (N.T., 9/14–28/98, at 1542). "Generally, in Pennsylvania a witness may not be impeached through evidence of specific instances of conduct which have not resulted in a conviction." *Petrasovits v. Kleiner*, 719 A.2d 799, 804 (Pa.Super.1998). *See* Pa.R.E. 404(b)(1).[16] Although the Jenckas contend that this testimony was relevant to prove Brinich's "intentions and whether he had any plan to ever finish the Jencka project[,]" (Jenckas' Brief at 27), we fail to see the connection. "Evidence is relevant if it tends to make a fact at issue more or less probable." *Martin v. Soblotney*, 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983). Brinich's use of his uncle's credit information and other alleged unspecified acts of past business misconduct, even if true, are not relevant to whether Brinich intended to finish construction on the Jencka home. Therefore, we find no error.

¶ 18 The Jenckas also attempted to present the testimony of George Gilbert, another former business associate of Brinich. The trial judge held an *in camera* hearing at which Gilbert testified that the partnership with Brinich dissolved because he could not trust Brinich, (N.T., 9/14–28/98, at 1564), whom he believed was subcontracting work that Gilbert felt Brinich should have done himself, and that these subcontractors were frequently not paid. However, Gilbert could recall only one instance when a subcontractor showed up at a job site demanding payment. (*Id.* at 1565–66).

¶ 19 Otherwise "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion." *Sprague v. Walter*, 441 Pa.Super. 1, 656 A.2d 890, 909 (1995), *appeal denied*, 543 Pa. 695, 670 A.2d 142 (1996). It is the task of the trial judge to balance the probative value of evidence against any prejudicial effect. *Henery v. Shadle*, 443 Pa.Super. 331, 661 A.2d 439, 444, *appeal denied*, 542 Pa. 670, 668 A.2d 1133 (1995). Here, the trial court found that Gilbert's testimony concerned a collateral attack on Brinich's credibility, and that the prejudicial effect of that testimony outweighed any probative value. We see no reason to disagree. A review of Gilbert's testimony makes clear that these former business partners had a falling out, and that, as the trial judge noted, Gilbert's testimony lacked sufficient "quantity and quality" to demonstrate Brinich's intent to abandon the Jencka project, or a habit of failing to pay subcontractors and passing bad checks. (N.T., 9/14–28/98, at 1574). Thus, the court properly denied the Jenckas' request for a new trial on this basis.

¶ 20 Next, the Jenckas contend the trial court erred in failing to grant JNOV, a new trial, or a remittitur on Brinich's defamation claim against Mr. Jencka. This claim arose from comments Mr. Jencka made to a subcontractor and a laborer while Brinich was absent from the job site. Brinich's molding subcontractor, Todd Lesnett, testified that on one such occasion,

[Mr. Jencka] wanted to know where he [Brinich] was. He wanted to know how a job could be run without the contractor being on the job. He wondered where all the money was going. At one time he asked me if I had thought John had a drug problem[.]

(*Id.* at 137). Lesnett noted that although Mr. Jencka worded his concern in the form of a question, "he was emphatic that it was a problem." (*Id.* at 144). Lesnett testified that he laughed off the suggestion initially, but later began to take it seriously and questioned it himself.

---

16. We note that the Pennsylvania Rules of Evidence went into effect on October 1, 1998, after the trial in the present case was completed.

¶ 21 Devon Babcock, one of Brinich's laborers, testified that Mr. Jencka also insinuated to him that Brinich had a drug problem. He testified that

Mr. Jencka was leading a lot of people to believe that they were not going to be getting paid.... He was saying John was spending our money in another way, on the trip, and he was leading on this issue towards drugs.

(*Id.* at 201). Babcock stated that Mr. Jencka "commented that John had nose bleeds because of drugs.... He was emphasizing the nose bleeds to drugs for some reason and us not getting paid." (*Id.* at 201, 203).

¶ 22 A plaintiff's burden of proof in a defamation claim is codified at 42 Pa. C.S.A. § 8343:

(a) **Burden of plaintiff.**—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

Here, the trial court found that the statements rose to the level of slander *per se*, and, therefore, Brinich was required to prove only general damages such as personal humiliation. We agree.

¶ 23 Statements by a defendant imputing to the plaintiff a criminal offense, punishable by imprisonment, or conduct incompatible with the plaintiff's business constitute slander *per se*. Restatement (Second) of Torts § 570(a), (c). *See also Id.* at § 571 (discussing criminal conduct), § 573 (discussing imputations affecting business). In the present case, Mr. Jencka insinuated to both Lesnett and Babcock that Brinich was using funds from the construction loan to support an illegal drug habit. Although Mr. Jencka contends that he merely questioned Brinich's whereabouts since he was not on the job site, and inquired whether anyone was drinking or using drugs since there were empty beer cans on the site, Lesnett and Babcock perceived Mr. Jencka's comments differently. They both testified that Mr. Jencka implied that Brinich was using drugs and supporting his habit with funds he should have been using to pay the subcontractors. The jury obviously believed their testimony, as was its prerogative.

¶ 24 When a communication constitutes slander *per se*, a plaintiff is not required to prove special harm, *i.e.*, pecuniary loss. Rather, "a defendant who publishes a statement which can be considered slander *per se* is liable for the proven, actual harm the publication causes." *Walker v. Grand Central Sanitation, Inc.*, 430 Pa.Super. 236, 634 A.2d 237, 244 (1993), *appeal denied*, 539 Pa. 652, 651 A.2d 539 (1994) (adopting Restatement (Second) of Torts § 621). Actual harm includes " 'impairment of reputation and standing in the community, ... personal humiliation, and mental anguish and suffering.' " Restatement (Second) of Torts § 621, Comment at b. (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Here, Brinich testified that when he learned of the statements, he became "[a]ngry, very angry," and that he confronted Mr. Jencka, who denied making the statements but conceded that he thought Brinich might have a drug habit because of the diminishing construction loan funds. (N.T., 9/14–28/98, at 636). Moreover, Lesnett testified that he was actually led to consider whether Mr. Jencka's suspicions might be true. (*Id.* at 145).

¶ 25 Mr. Jencka argues that Brinich's testimony that he was "momentarily angered" is insufficient to prove damages. (Jenckas' Brief at 38). We disagree. Brinich testified that when he learned of the comments he became so angry that he confronted Mr. Jencka. In addition, Brinich's subcontractor testified that, although he did not believe Brinich used drugs, he considered the possibility. We find this testimony sufficient to prove damages as a result of Mr. Jencka's slanderous comments. *Compare Walker*, 634 A.2d at 244–45 (holding jury was not presented with sufficient evidence to base damages award; recipient of communication testified that his opinion of plaintiff was unaffected by communication, and plaintiff did not testify that she suffered "any adverse emotional reaction or that [the communication] impeded her ability to gain employment."). Moreover, because the jury's verdict does not shock our sense of justice, we find that the trial court properly denied the Jenckas' motion for a new trial.

¶ 26 The Jenckas also requested, in the alternative, a remittitur. "The trial court may only grant a request for remittitur when a verdict that is supported by the evidence suggests that a jury was guided by partiality, prejudice, mistake or corruption." *Sprague*, 656 A.2d at 924. We will reverse a trial court order denying a remittitur only if the court abused its discretion or made an error of law. *Id.* Because the Jenckas failed to present any evidence that the verdict resulted from an improper consideration, they are entitled to no relief.

¶ 27 In their third claim, the Jenckas contend that the trial court erred in failing to grant JNOV or a new trial on Brinich's breach of written contract claim. Brinich claimed that he substantially completed the work under the CLA and was, therefore, entitled to full payment. However, the Jenckas deducted more than $11,000 from Draw # 4 and refused to authorize payment of the final $25,500 draw. The jury awarded Brinich $35,000 for this claim. The Jenckas argue that Brinich is not entitled to any additional funds because he specifically agreed to the distribution of Draw # 4, and failed to complete construction of the home.

¶ 28 Although it is clear that Brinich signed the Request for Payment for Draw # 4, he testified that he was compelled to do so because the Jenckas refused to authorize any payment unless they received a portion of the draw. Because he needed the funds to continue construction and pay his subcontractors, he agreed to accept only a portion of Draw # 4 at that time. Moreover, although the last Draw was payable upon completion, the Jenckas moved into the unfinished house on October 1, 1994, and thereafter refused to allow Brinich back onto the property.

¶ 29 The CLA provides that "[t]he Owner shall not, . . . take possession and the Contractor shall not deliver possession of the Property until the Improvements are completed and final Payment is made to the Contractor." (CLA at ¶ 15). Indeed, Karen Lauterbach, the loan administrator at Integra, testified that an October 19, 1994 report from the bank's appraiser noted that " 'Project is 98% complete and occupied by the borrowers.' " (N.T., 9/14–28/98, at 293). Moreover, Mr. Jencka testified that, prior to moving into the house, he received an occupancy permit from the township. (*Id.* at 1138). We find, therefore, that there was sufficient evidence for the jury to conclude that construction was complete for purposes of payment under the contract. Further, there was evidence that Brinich's failure to fully complete construction was due to the actions of the Jenckas in continually requesting changes and in refusing to allow Brinich on the premises.[17] Thus, we conclude that the

17. We disagree with the Jenckas' contention that "the parties' own written contract of September 9, 1994, circumscribes any right that Brinich would have to the last draw[.]"

trial court properly denied the Jenckas' request for JNOV and, as the verdict does not shock our sense of justice, a new trial.

¶ 30 The Jenckas' next issue concerns the trial court's denial of their motion for JNOV, a new trial, or a remittitur on Brinich's oral contract claim. The Jenckas contend that Brinich failed to present clear and convincing evidence that the parties orally contracted to modify the specifications of the construction plans; that the evidence of Brinich's damages for this claim violates the parol evidence rule; and that, in any event, Mrs. Jencka should not be held jointly and severally liable for any breach of an oral contract as there was no evidence that she requested or approved any modifications.

 ¶ 31 In the present case, each of the contract documents provides that any modifications must be in writing, signed by the parties. *See* 8/10/93 Agreement at Article III; CLA at ¶ 4, ¶ 23; Specifications at 1. However, it is well established that "[a] written contract which is not for the sale of goods may be modified orally, even when the written contract provides that modifications may only be made in writing." *Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc.*, 454 Pa.Super. 188, 685 A.2d 141, 146 (1996).

An agreement that prohibits non-written modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing. An oral contract modifying a prior written contract, however, must be proved by clear, precise and convincing evidence.

*Id.* (citations omitted).

¶ 32 Brinich testified that the Jenckas requested numerous additions and modifications during construction of their home. He explained that,

usually every morning when we walked into the job site we found a note or some kind of notations from Mr. Jencka usually, sometimes Mrs. Jencka, to do different things; to change something or move something or, you know, about when are we going to get this done; when are you going to get that done; I need this done and I need that done. There was just always a note. Guaranteed first thing in the morning there was a note.

(N.T., 9/14–28/98, at 629). He testified that all of the modifications were discussed with and approved by the Jenckas, (*id.* at 614), and that he informed the Jenckas that any modification would be invoiced at cost plus a 20% markup. (*Id.* at 811–12).

¶ 33 In addition to his own testimony, there was other evidence supporting Brinich's claim that the Jenckas requested and approved modifications. Todd Lesnett, the molding subcontractor, testified that the Jenckas constantly left notes on the job site requesting changes and/or modifications to the construction. (*Id.* at 135). Moreover, Mr. Jencka admitted that there were modifications to the original construction plans, although he testified that the changes were not requested or approved by him, that Brinich did not inform him that he would be billed for extra costs, and that they never discussed invoicing at cost plus 20%. (*Id.* at 1068, 1079, 1106, 1162–63). He does acknowledge, however, that he paid one invoice for additional framing work that Brinich submitted in April, 1994. (*Id.* at 1089–91). Moreover, he admitted leaving notes in the house, but claimed they were in the form of questions rather than requests, *i.e.*, "why isn't this done; why is it done this

(Jenckas' Brief at 45). That Agreement simply states that the Jenckas will provide the necessary materials to complete construction and will be reimbursed by Integra "for the actual cost of said remaining items as evidenced by original paid-in-full receipts." (Answer to Amended Complaint, New Matter and Counterclaim Filed on Behalf of the Jenckas, Exhibit 6, Agreement, dated 9/9/94). As none of the trial exhibits are included in the certified record, we are unable to ascertain whether the Jenckas provided such receipts and, if so, whether they accounted for the entire $25,500 of the final draw.

way; what are you doing; when are we going to be finished; when are we going to move in[.]" (*Id.* at 1152).

¶ 34 The issue of oral modifications to the construction contract was vigorously contested at trial. We agree with the trial court that there was sufficient, clear and convincing evidence for the jury to conclude that the Jenckas requested and approved oral modifications to the original contract. We note that Mr. Jenckta visited the job site almost every day and was aware of the many modifications to the original plans. *See Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 558, 244 A:2d 10, 15 (1968)(finding implied promise to pay for extras to construction contract when owner's agent requested changes, was informed of extra cost, promised to pay, and was frequently on construction site; "it is not unreasonable to infer that he was aware that extra work was being done without proper [written] authorization, yet he stood by without protesting while the extras were incorporated into the project."). The jury, having had the opportunity to review all of the relevant contract documents and the alleged modifications, chose to believe the testimony of Brinich.[18] Moreover, as the verdict does not shock our sense of justice, *Martin, supra,* we find that the trial court properly denied the Jenckas' request for a new trial. Finally, the Jenckas' motion for remittitur must fail as the Jenckas have again neglected to provide any evidence that "the jury was guided by partiality, prejudice,

mistake or corruption," *Sprague*, 656 A.2d at 924, in rendering their verdict.[19]

¶ 35 The Jenckas also contend that Brinich's testimony concerning damages violated the parol evidence rule. Brinich testified that he told the Jenckas "maybe prior to closing" that any change to the contract would be billed at the standard industry price of cost plus 20%. (N.T., 9/14–28/98, at 812). The Jenckas argue that because this discussion allegedly occurred prior to or contemporaneous with the execution of the CLA, testimony concerning it is barred by the parol evidence rule. We disagree.[20]

¶ 36 The parol evidence rule bars admission of oral testimony which purports to explain or vary the terms of an integrated written agreement. *Lenzi v. Hahnemann University*, 445 Pa.Super. 187, 664 A.2d 1375, 1379 (1995). "Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, ... [a]lleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by that contract." *McGuire v. Schneider, Inc.*, 368 Pa.Super. 344, 534 A.2d 115, 117 (1987), *aff'd*, 519 Pa. 439, 548 A.2d 1223 (1988). Here, the CLA contains an integration clause which provides that the "Agreement constitutes the entire agreement among the parties and there is no other understanding, oral or written, relating to the subject matter." (CLA at ¶ 23).

18. The Jenckas' contention that these alleged "extras" were, in actuality, items included under the original construction contract contrasts sharply with the testimony of Brinich. Again, the jury simply credited Brinich's testimony as was their prerogative.

19. In their brief, the Jenckas argue that the damages award was excessive because it "included the cost for items that were already required under the construction contract (but in different form)[.]" (Jenckas' Brief at 53). However, this argument assumes the accuracy of Mr. Jencka's testimony. The jury heard conflicting testimony from Brinich and was

provided with copies of all the relevant agreements between the parties, including the construction plans. Simply because the jury chose to believe Brinich's evidence is not sufficient reason to grant a remittitur.

20. Brinich contends this issue is waived because the Jenckas' failed to object to the admission of the evidence at trial. We note, however, that the Jenckas' counsel raised a timely and specific objection following the conclusion of Brinich's testimony. *See* N.T., 9/14–28/98, at 975.

However, while the Agreement requires all such modifications to be memorialized in a writing signed by the parties, it contains no provision setting forth the cost of any additions and/or modifications to the contract specifications. Therefore, since the alleged oral agreement is not addressed in the written contract, we find that the parol evidence rule does not bar admission of Brinich's testimony.

¶ 37 The Jenckas also argue that Mrs. Jencka should not be held jointly and severally liable for any damages awarded under the oral contract claim because there was no evidence that she requested or approved any of the modifications.

> [U]nder Pennsylvania law, there is a presumption with respect to property held by the entireties that either spouse has the power to act for both without specific authority, so long as the benefit of such action inures to both. "The presumption then stands unless and until the other spouse establishes by a preponderance of the evidence that, at the time the contract was made and the services were performed under it, the contracting spouse was in fact not authorized to act for and to bind her in contracting for improvement of the entireties property, the benefits of which ran in favor of both tenants by entireties."

*Bradney v. Sakelson*, 325 Pa.Super. 519, 473 A.2d 189, 191 (1984)(quoting *J.R. Christ Construction Co. v. Olevsky*, 426 Pa. 343, 349–50, 232 A.2d 196, 199 (1967)). Here, the Jenckas admit that they held the property as tenants by the entireties. *See* Jenckas' Brief at 40. Mrs. Jencka did not testify in the instant trial. Therefore, she presented no evidence to overcome the presumption that her husband acted with her authority when he entered into oral

modification contracts with Brinich.[21] In addition, Brinich testified that Mrs. Jenka, herself, left several of the notes requesting modifications. *See* N.T., 9/14–28/98, at 629. Thus, she is entitled to no relief on this claim.

¶ 38 In their next issue, the Jenckas contend that the trial court erred in failing to grant JNOV or a new trial on their counterclaim for liquidated damages. On June 29, 1994, the parties executed an agreement extending time for completion of construction until July 21, 1994. That agreement contains the following provision for liquidated damages.

> [I]n the event that Contractor fails to fully complete all work required under Exhibit "A", by July 21, 1994, then, in that event, Contractor shall be liable to Owners in the amount of Two Hundred Fifty Dollars ($250.00) per day in liquidated damages for each day after July 21, 1994 that Contractor fails to fully complete all work required under Exhibit "A". It is further agreed and understood by Contractor that the amounts stated herein for liquidated damages are not a penalty, but are liquidated damages due and owing to the Owners from the Contractor.

(6/29/94 Agreement, at ¶ 4). Because it is undisputed that Brinich failed to complete construction prior to October 1, 1994, when the Jenckas moved in, the Jenckas argue that, pursuant to the agreement, Brinich is responsible for liquidated damages from July 22, 1994 until October 1, 1994.

¶ 39 Under Pennsylvania law, [p]arties to a contract may include a liquidated damages provision which ensures recovery in cases where the computation of actual damages would be

---

**21.** As evidence of Mrs. Jencka's implicit repudiation of any oral modification contract, the Jenckas point to Brinich's testimony regarding a meeting with the Jenckas in August 1994 at which they discussed the diminishing funds for the project. Brinich testified that when he pointed out the numerous modifications to the original contract, Mrs. Jencka said " 'Don't tell me there were changes to this house, it's the way it's supposed to be.' And she stormed out." (N.T., 9/14–28/98, at 642). We hardly think this one statement, made in the heat of anger, overcomes the presumption that Mr. Jencka ordered changes in the construction with his wife's full knowledge and authority.

speculative. Such clauses are enforceable provided that, at the time the parties enter into the contract, the sum agreed to constitutes a reasonable approximation of the expected loss rather then [sic] an unlawful penalty.

*Carlos R. Leffler, Inc. v. Hutter*, 696 A.2d 157, 162 (Pa.Super.1997). In determining whether the stipulated damages amount is, in actuality, a penalty, we look to the intention of the parties and " 'consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the several breaches provided against, the ease or difficulty of measuring a breach in damages[.]' " *Hanrahan v. Audubon Builders*, 418 Pa.Super. 497, 614 A.2d 748, 750 (1992) (quoting *Commonwealth v. Musser Forests, Inc.*, 394 Pa. 205, 212, 146 A.2d 714, 717 (1958)).

¶ 40 In the present case, the Jenckas provided very little evidence of any actual costs they incurred due to the delay in the construction of their home. Mr. Jencka testified that the liquidated damages provision was suggested by Karen Lautenbach at Integra to "put some teeth" in the agreement, and to encourage Brinich to finish the project on time. (N.T., 9/14–28/98, at 1372). He claims that the amount represented "[c]osts that we were experiencing out of pocket[.]" (*Id.*). However, his testimony concerning these "out of pocket" expenses was not limited to the period between July 22, 1994 until October 1, 1994. Mr. Jencka's testimony concerning their "damages" included such items as $13,000 in credit card interest from 10/93 until 3/95; $13,000 in student loan capitalization; $2000 in mileage; $6,200 in mortgage payments from 12/93 until 9/94; $2750 in living expenses from 1/94 until 9/94;[22] and $2200 in storage expenses from 1/94 until 9/94. *See Id.* at 1274–78. The only expenses relevant to determining the legitimacy of the liquidated damages clause are those for stor-

age and living expenses during the period from July 22, 1994 until September 30, 1994. These items total approximately $550 per month, or less than $20 per day. Even if we include the Jenckas' mileage expenses, *i.e.*, the travel time between their parents' homes, the total of these costs still account for less than $30 per day. Therefore, because the Jenckas failed to present sufficient evidence justifying the $250 per day liquidated damages figure, we conclude that it was a penalty and, thus, unenforceable.

¶ 41 In their final claim, the Jenckas argue that the trial court erred in failing to remove the nonsuit or grant a new trial on the Jenckas' counterclaim against Brinich for misappropriation of funds and their third party claims for conversion and civil conspiracy. At the end of the Jenckas' case-in-chief, plaintiff's counsel moved for a nonsuit on these claims, and the trial court granted the motion.

¶ 42 A nonsuit is proper "only if the jury, viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action had been established." *Orner v. Mallick*, 432 Pa.Super. 580, 639 A.2d 491, 492, *appeal denied*, 539 Pa. 668, 652 A.2d 839 (1994). A jury, however, is not permitted to reach its verdict based on mere conjecture or speculation. *Id.* This Court will reverse an order denying a motion to remove a nonsuit only if the trial court abused its discretion or made an error of law. *Emge v. Hagosky*, 712 A.2d 315, 317 (Pa.Super.1998).

¶ 43 The Jenckas argue that they presented sufficient evidence of conversion and civil conspiracy to permit these issues to go to the jury. They contend that "Brinich had a specific contractual duty to apply all the construction loan funds received to the job so to construct the dwell-

---

22. The Jenckas lived separately, each with his/her respective parents, while their home

was under construction.

ing, to pay subcontractors and material-men[,]" (Jenckas' Brief at 56); however, instead, he, his wife and his mother-in-law used the funds for their own purposes.

¶ 44 "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." [23] *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112, 114 (1987). "In order to state a cause of action for civil conspiracy, a plaintiff must show 'that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.'" *Skipworth v. Lead Industries Ass'n, Inc.*, 547 Pa. 224, 235, 690 A.2d 169, 174 (1997)(quoting *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979)).

¶ 45 Paragraph 13 of the CLA provides that "all Payments shall be used ... for the payment of labor, materials and services necessary for Improvements." (CLA at ¶ 13). Moreover, as the Jenckas point out, both Julie Brinich and Christine Meliza admitted in their Answer to the third party Complaint that some of the checks written from the Brinich account during the relevant time period were for their "own purposes and/or to parties unrelated to the construction of the Jencka dwelling[.]" (Answer to Complaint to Join Additional Defendants, at ¶¶ 7, 8). However, Mrs. Brinich and Meliza specifically denied any wrongdoing.

¶ 46 Although the CLA requires the construction loan funds be applied to the construction of the Jencka home, the Agreement does not mandate that the funds be deposited into a separate, restricted account. *See* N.T., 9/14–28/98, at 223 (testimony of Karen Lauter-

bach). The fact that the construction loan funds were deposited in Brinich's general business account, and, accordingly, utilized to pay the expenses of his business, does not demonstrate that Brinich misappropriated these funds, or used them for an improper purpose. Mrs. Brinich testified that most of the checks she wrote to her husband were his pay for the work he had completed. (*Id.* at 66–67). Christine Meliza testified that she wrote checks to herself at the direction of Brinich as repayment for loans she·had made to him during construction of the Jencka home.[24] *See generally Id.* at 389–96, 411–12. Moreover, both women testified that some of the payments to Brinich provided him with cash to purchase supplies while on the job site. (*Id.* at 67, 386, 403). We agree with the trial court that the Jenckas "failed to advance evidence at trial indicating Julie Brinich and Meliza maintained improper control over the construction loan proceeds." (Trial Ct. Op. at 9). Similarly, in the absence of any evidence suggesting that Brinich, his wife, and Meliza agreed to commit an unlawful act, the Jenckas' claim for civil conspiracy must fail.

¶ 47 Therefore, because we find that the trial court did not err in denying the Jenckas' various claims for post trial relief, we affirm the judgment.

¶ 48 Judgment affirmed.

---

23. Although the Jenckas' counterclaim against Brinich is characterized as one of misappropriation of funds, it differs not at all from their claim of conversion. In both cases, the Jenckas allege that construction loan funds were used for purposes other than the construction of their home.

24. Meliza noted that she loaned an additional $62,000 to Brinich for which she has still not been repaid. (*Id.* at 412).