J-A26020-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOHN MATUSEK, SR., SPOUSE AND EXECUTOR OF THE ESTATE OF ANGELINE P. MATUSEK, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JAMES R. BRUNO, M.D., THOMAS J. CASTELLANO, M.D., JOHN ROTHSCHILD, M.D., GARY DECKER, M.D., MARK BERNARDI, D.O., GEISINGER WYOMING VALLEY MEDICAL CENTER, GEISINGER HEALTH SYSTEM FOUNDATION, | |
| Appellees | No. 279 MDA 2014 |

Appeal from the Judgment Entered March 18, 2014
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 4735 OF 2006

BEFORE:  BOWES, MUNDY, and JENKINS, JJ.

MEMORANDUM BY BOWES, J.:          **FILED FEBRUARY 05, 2015**

This is an appeal from the March 18, 2014 judgment entered in favor of Thomas J. Castellano, M.D. and Gary Decker, M.D., in a wrongful death and survival action commenced by John Matusek, Sr. ("Executor"), in his capacity as the Executor of the Estate of Angeline P. Matusek ("Decedent"), his late wife.[1]   Executor alleged that the negligence of various medical

_____

[1]  Executor purported to appeal from the denial of the motion to remove the nonsuit, which is an interlocutory order and generally not appealable. The appeal properly lies from the final judgment.  Executor timely complied

*(Footnote Continued Next Page)*

professionals in their treatment of Decedent resulted in her death.[2]  At the conclusion of Executor's case, the trial court entered a nonsuit, and declined to remove it by order dated December 9, 2013.  After thorough review, we affirm.

On April 13, 2004, Decedent underwent total left knee replacement surgery.  As is standard prior to surgery, she was placed on the antibiotic Clindamycin to prevent infection.  After surgery, she participated in physical therapy and was discharged on April 22, 2004.  Three days later, she was taken by ambulance to Berwick Hospital with complaints of severe diarrhea, vomiting, chest discomfort, and dehydration.  Doctors there tentatively diagnosed Clostridium Difficile, commonly known as C. Diff., and treated her with Flagyl administered orally.  Thereafter, Decedent was transferred to Geisinger Wyoming Valley Medical Center ("Geisinger" or "hospital") for treatment of both the C. Diff and chest discomfort, and she was placed under the care of Dr. Bernardi, a cardiologist.  When the cardiologists determined that her problems were not heart-related, and her condition

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

with this Court's order directing him to enter final judgment, and thus, we have jurisdiction to entertain this appeal.  ***See Staiger v. Holohan***, 2014 PA Super 200 (Pa.Super. 2014).

[2]  Mark Bernardi, D.O., Decedent's admitting cardiologist, was excused following the filing of an affidavit of non-involvement.  James R. Bruno, M.D. and John Rothschild, M.D., reached settlements with Executor prior to trial, and Geisinger Wyoming Medical Center and Foundation were dismissed by stipulation.

continued to deteriorate, they brought in other consultants to address the C. Diff. Dr. Decker, a specialist in infectious disease and Dr. Malhotra, a surgeon, were consulted. Dr. James R. Bruno and his practice assumed responsibility for Decedent's medical management, and he requested a gastroenterology consult from Dr. Castellano and a renal consult from Dr. John Rothschild.

Dr. Decker first examined Decedent on April 27, 2004. He continued the Flagyl, but doubled the dosage and changed the order to IV administration of the drug. Nonetheless, blood test results on April 28 revealed that Decedent's white blood cell count had risen substantially. Decedent complained of abdominal pain and there were signs of acidosis and systemic failure. Dr. Malhotra, the surgeon who saw her on the morning of April 28th noted that she was stable at the moment, but asked to be re-consulted if the patient deteriorated clinically. Dr. Decker saw Decedent within several hours of the surgeon and did not change her treatment. Drs. Rothschild and Bruno changed her IV fluids and Dr. Rothschild noted renal failure that could require dialysis. During the afternoon of April 28, the Decedent's condition deteriorated and she was transferred to the ICU.

On the afternoon of April 29, the intensivist in the ICU sought a surgical consult. At that point, Decedent's condition had worsened. Her abdomen was septic, her colon infarcted. An emergency exploratory laparotomy performed at 4:00 p.m. revealed peritonitis, toxic mega colon

and overall scatted infarctions. The surgeon removed the colon but she continued to deteriorate. Ms. Matusek died at 10:56 p.m.

At trial, Executor and the couple's daughter testified. He also offered via videotaped deposition the expert testimony of Dr. Harold Lipsky, a physician who was double board-certified in internal medicine and gastroenterology. Dr. Lipsky opined that the failure of the defendant physicians to recognize and address the signs of an acute abdomen in light of Decedent's severe C. Diff. and rapid deterioration on April 28 was a deviation from the standard of care. Deposition, Harold Lipsky, M.D., 9/9/13, at 55. He testified that there was a window in the afternoon and evening of April 28 when, had Decedent undergone surgery, she would have had a chance to survive. He criticized the defendants' failure to obtain another surgical consult during that window. He also opined that Decedent should have been started earlier on oral Vancomycin, and that the failure to do so increased the risk of harm and death.

Dr. Edward Weissman,[3] board-certified in internal medicine, testified contrary to Dr. Lipsky that it was not a violation of the standard of care to wait until April 28 to start Vancomycin and that the medication regimen was appropriate. He also noted that Decedent was stable at 10:00 a.m. that morning when she was examined by Dr. Decker. Dr. Castellano's partner,

---

[3] Dr. Weissman's name is spelled both Weismann and Weissman throughout the record.

Dr. Fried, also saw Decedent that morning, and the expert opined that these physicians acted within the standard of care at that time. The expert added, "Things changed later in the day." N.T. Trial, 9/10-13/13, at 333. He agreed with Dr. Lipsky that a surgical reassessment should have been ordered during the afternoon of April 28, and that this deviation from the standard of care increased the risk of harm.

The defendant physicians were called to testify as on cross-examination. Dr. Castellano confirmed that his partner, Dr. Fried, supervised the Decedent's care on April 28, 2004. Dr. Decker testified that he did not see Decedent later on April 28, and that nurses did not notify him of her decline.

At the close of Plaintiff's case, the defense moved for a nonsuit, which the trial court granted. The court relied in large part upon **Mudano v. Philadelphia Rapid Transit Co.**, 137 A. 104 (Pa. 1927) and **Brodowski v. Ryave**, 885 A.2d 1045 (Pa.Super. 2005), in holding that the absolute conflict between the testimony of Plaintiff's two experts warranted a nonsuit. The court also found that Executor had failed to prove that the standard of care required defendant physicians to call the hospital to ascertain Decedent's declining condition and order the surgical consult.

On September 20, 2013, Executor filed a motion to remove the nonsuit and, in the alternative, a motion for new trial. The motions were

denied on December 9, 2013, and Executor timely appealed. He raises one issue for our review:

I.    Did the court abuse its discretion by relying on the holding in **Mudano** (**Mudano v. Philadelphia Rapid Transit Co.**, 289 Pa. 51, 137 A. 104 (1927)) as the sole basis for entering a compulsory non-suit where there [sic] Plaintiff has presented two experts that have testified to Defendants' breach of the standard of care?

Appellant's brief at 4.

In reviewing the denial of a motion to remove a nonsuit,

> Our standard of review . . . is well-established. Nonsuit is properly entered where it is clear that the plaintiff has not established a cause of action or right to relief. Pa.R.C.P. 230.1. In determining whether the plaintiff has established a right to relief, [t]he plaintiff must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of the plaintiff. Further, [i]t has been long settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. However[,] where it is clear a cause of action has not been established, a compulsory nonsuit is proper. We must, therefore, review the evidence to determine whether the order entering judgment of compulsory nonsuit was proper.

> **Braun v. Target Corp.**, 2009 PA Super 206, 983 A.2d 752, 764 (Pa. Super. 2009). "This Court will reverse an order denying a motion to remove a nonsuit only if the court abused its discretion or made an error of law." **Brinich v. Jencka**, 2000 PA Super 209, 757 A.2d 388, 402 (Pa. Super. 2000).

**Staiger v. Holohan**, 2014 PA Super 200.

Executor contends that the trial court erred in relying upon **Mudano** and **Brodowski** as the basis for granting the nonsuit. He disputes that

there was a direct irreconcilable conflict between the testimony of his experts Dr. Lipsky and Dr. Weissman and characterizes any inconsistencies in their standard of care testimony as "minor." Appellant's brief at 21. In finding the expert testimony to be in direct conflict, Executor alleges that the trial court failed to view the evidence in the light most favorable to Executor. Moreover, he maintains that the **Mudano** rule was modified in **Brannan v. Lankenau Hospital**, 417 A.2d 196 (Pa. 1980), to allow juries to resolve conflicts in expert testimony. **See Gorfti v. Montgomery**, 558 A.2d 109, 111 (Pa.Super. 1989) (recognizing modification of **Mudano** in **Brannan**, and characterizing the expert testimony in the latter as "suffer[ing] from minor internal inconsistencies rather than absolute divergences as to liability").

Defendant physicians counter that the testimony of the two experts was irreconcilable regarding the timing of the administration of oral Vancomycin. Dr. Lipsky's only criticism of the drug regimen was that he would have started Decedent on oral Vancomycin at the same time as he switched the patient to IV Flagyl, *i.e.*, on April 27. Dr. Weissman opined that it was appropriate to add oral Vancomycin on April 28 and that both changes were "reasonable" and "within the standard of care." N.T. Trial, 9/10-13/13, at 309-10. Defendant physicians maintain that the trial court was correct in applying **Mudano** and entering a compulsory nonsuit on the Vancomycin issue.

In *Mudano, supra*, our Supreme Court addressed the situation where a party's experts present testimony that is in direct conflict regarding a fundamental issue such as breach of the standard of care or causation. The Court reasoned that

> If plaintiff calls more than one expert, there must be no absolute contradiction in their essential conclusions; for, since he, carrying the burden of proof, is asking that a certain definite scientific inference shall be drawn from given facts, and is producing witnesses, accredited by him as specially qualified to draw deductions from such facts, to inform the jury, on his behalf, as to what that inference should be, it is his duty to furnish consistent, and not inconsistent, advice, -- otherwise the jury would be confused rather than instructed. Lacking scientific knowledge themselves, the members of the jury, in a case like the present, when called upon to determine whether a particular physical condition is the result of the accident (or of another cause, unrelated thereto), are not obliged to choose between contradictory advice tendered by plaintiff's medical experts; the law imposes no such duty on jurors, -- though it does at times require them to determine whether to accept the advice of experts on one side or the other of a case.

*Mudano*, *supra* at 107.

In *Brannan*, *supra*, the trial court refused to strike a nonsuit that it granted in favor of two physicians based upon the rule in *Mudano*. Plaintiff had four distinct theories of negligence against Dr. Rex, one of which included failing to timely diagnose and treat the plaintiff's punctured esophagus. As to Dr. West, plaintiff alleged that he was negligent in failing to administer antibiotics earlier. The plaintiff offered the testimony of one expert witness. The trial court, citing *Mudano*, entered a nonsuit at the close of the plaintiff's case regarding the negligent administration of

antibiotics based on its determination that the expert "gave contradictory statements with regard to" the defendant physicians' negligence. In addition, the court found that the expert's testimony made it clear that the defendants "acted consistently with a respected body of medical thought." *Id*. at 199.

This Court affirmed, and the Supreme Court reversed. The High Court found that the expert offered competent testimony establishing that the physicians did not administer antibiotics at the earliest opportunity. The expert testified that the recognized standard of care required the administration of antibiotics immediately upon suspicion of a perforated esophagus and that both defendants were negligent in failing to administer drugs when perforation was first suspected. The Supreme Court rejected this Court's view that the expert had equivocated so much on cross-examination as to render his opinion conjecture, and concluded that the expert's "relatively minor divergence" had not "sufficiently compromised" the expert's direct testimony "to justify removal of this issue from jury consideration." *Id*. at 200. In so holding, the Court limited application of *Mudano* to the situation where the plaintiff's experts "so vitally disagree on essential points as to neutralize each other's opinion evidence." *Id*.

We found such a situation in *Brodowski v. Ryave*, 885 A.2d 1045, 1060 (Pa.Super. 2005). Recognizing that a plaintiff in a medical malpractice case must present expert testimony to establish the applicable standard of

care, its deviation, causation, and the extent of the injury, we found that the experts were "in irreconcilable conflict" regarding the standard of care applicable to one of the defendant physicians, Dr. Varganos. *See Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003). Dr. Varganos was a cardiologist who consulted in the emergency room, who identified a life–threatening illness, and who had privileges to admit patients. Plaintiff's first expert opined that Dr. Varganos should have admitted the plaintiff on his own service with a neurology consult and initiated heparin therapy or consulted neurology from the emergency room. According to the first expert, it was not enough to merely recommend to the treating physician that a neurologist be consulted. Plaintiff's second expert felt it was appropriate for the plaintiff to have been seen by a neurologist, but maintained that it was the admitting physician's duty to obtain that consultation. We found these opinions regarding whose duty it was to obtain the neurology consultation to be in absolute conflict regarding the essential issue of the standard of care applicable to Dr. Varganos. Since the conflicting opinions would lead to jury speculation, the very ill the *Mudano* rule was designed to prevent, we found that the trial court correctly removed this issue from the jury consideration.

We find no abuse of discretion in the application of *Mudano* on the issue of the timing of the administration of Vancomycin. Dr. Lipsky testified on direct examination that the standard of care required that the drug be

initiated on April 27; Dr. Weissman opined that its administration on April 28 was appropriate. Thus, according to one of plaintiff's experts, the defendant physicians deviated from the standard of care; according to the other, they met the standard of care. We agree with the trial court that these experts were so directly in conflict as to the standard of care as to effectively neutralize each other. Nonsuit on this theory was appropriate.

Executor's second theory of liability was that the defendant physicians were negligent in failing to obtain another surgery consult during the afternoon or evening of April 28. Both Dr. Lipsky and Dr. Weissman agreed that a surgical consult was indicated at that time, and thus, the experts' testimony does not present the type of direct conflict contemplated by *Mudano*. Dr. Castellano argues, however, that since he did not treat the Decedent on April 28, 2004, and the Executor's experts did not establish that the standard of care required him to call and check on Decedent that day, the facts and evidence adduced do not support a finding that he breached the standard of care. Dr. Decker advances a similar argument. He acknowledges that Dr. Weissman initially testified that his failure to call the hospital and check on Decedent was a breach of the standard of care. However, he points to Dr. Weissman's subsequent testimony that, by relying upon nurses to notify him if the patient declined, Dr. Decker was acting within the standard of care. He posits that *Mudano* precludes the

submission of this contradictory standard of care testimony to the jury. For the following reasons, we agree.

Assuming that the Decedent's condition deteriorated during the afternoon and evening of April 28, and that another surgical consult was indicated during that timeframe, Executor does not establish a breach of the standard of care on the part of these two specific doctors. Dr. Decker saw Decedent in the morning of April 28, shortly after the second surgery consultation. Executor's experts agreed that the Decedent was stable that morning, and that it was not a deviation from the standard of care not to perform surgery at that time despite the fact that her white blood count had risen substantially. It was undisputed that Decedent's condition had not deteriorated between the surgical consult and Dr. Decker's visit shortly thereafter. Both experts agreed that Dr. Decker did not breach the standard of care when he did not order another surgical consult at that time. Dr. Decker did not see Decedent during the remainder of that day. He did not call the hospital, as no test results were outstanding, and there was no note in the chart reflecting that the nursing staff contacted him regarding Decedent.

Dr. Castellano testified that the initial consult came to his practice group. Since he was the physician assigned to Geisinger on April 27, 2004, the Decedent was his patient the first day. He and his partner, Dr. Fried, would alternate days at Geisinger. Dr. Castellano treated Decedent on

April 27 and 29, 2004; Dr. Fried saw Decedent on the morning of April 28, 2004. It was undisputed that Dr. Castellano did not see the patient during the pertinent window of time. Furthermore, the records do not reflect that the nursing staff contacted either Dr. Castellano or Dr. Fried during the afternoon or evening of April 28.[4]

Dr. Lipsky did not offer any basis for holding these two physicians responsible, neither of whom saw the patient during the relevant time, for failing to recognize and address the signs of an acute abdomen and rapid deterioration. Dr. Lipsky offered no opinion suggesting that it was a breach of the standard of care for Defendant physicians not to contact the hospital regarding Decedent. Thus, there was no testimony from Dr. Lipsky that Drs. Decker or Castellano knew or should have known of the Decedent's deteriorating condition. *See*, *e.g.*, ***Whittington v. Episcopal Hosp.***, 768 A.2d 1144, 1154 (Pa.Super. 2001) (finding hospital had constructive notice of patient's adverse condition when its nurses should have known but failed to act).

Dr. Weissman conceded that there was nothing in the chart indicating that the hospital called Dr. Decker after he saw Decedent that morning with any additional information on her condition. N.T. Trial, 9/10-13/13, at 331-

_____

[4] Evidence was adduced that Decedent's daughter called the practice that day and that Dr. Fried was informed that she called. Neither Dr. Fried nor the medical practice were defendants in the lawsuit.

32.   The expert acknowledged that Dr. Rothschild was actively ordering blood cultures and gases, basic metabolic profile, and bicarbonate and managing Decedent's renal function during that time.  He agreed that the records reflected that a physician from the cardiology service was involved in Decedent's care and ordered her to be transferred to the ICU that afternoon. Yet, Dr. Weissman opined that Drs. Decker and Castellano should have called the hospital to check on Decedent's condition, and that failure to do so constituted a deviation from the standard of care.  *Id*. at 351.

Had Dr. Weissman steadfastly maintained this position, nonsuit on the issue of failure to obtain a surgical consult would not have been proper. However, on cross-examination, Dr. Weissman conceded that the standard of care did not require a doctor to be at the hospital twenty-four hours per day, seven days per week.  *Id*. at 352.  More importantly, he agreed that doctors with a patient in the hospital had a right to rely upon nurses to monitor a patient's condition and notify the physician if there was a change. *Id*. at 353.  In fact, Dr. Weissman agreed that it was the standard of care for nurses to act as the eyes and ears of the physician round the clock, and pick up the telephone and notify the physician of any significant change in the patient's condition.  *Id*.  The trial court viewed such testimony as wholly inconsistent with his earlier testimony that the standard of care required the physicians to call the hospital.

The problem with Executor's proof was that the expert testimony, together with the other evidence of record, viewed in the light most favorable to Executor, failed to make out a *prima facie* case of negligence against these two physicians. It was undisputed that they did not see Decedent during the relevant time. There was no evidence that they knew or were apprised of Decedent's decline. Any assertion of negligence hinged on evidence that they should have known and responded accordingly.[5] Dr. Lipsky did not address this issue. Dr. Weissman attempted to cure this deficiency when he opined that Drs. Decker and Castellano should have called into the hospital to check on Decedent during the afternoon of April 28. However, he retreated from that position on cross-examination, and agreed that the standard of care was for nurses to notify doctors if the patient's condition deteriorated. Since neither physician was contacted, the court found that Dr. Weissman's inconsistent testimony left the jury with "nothing but conjecture to guide them as to whether or not these particular

_____

[5] In addition to Dr. Weissman's conflicting testimony regarding a duty to contact the hospital, there was testimony from Dr. Lipsky that as a consultant, he would generally go through the medical management if he felt a patient needed a surgical consult. The record reveals that it was the house intensivist in the ICU who ultimately consulted surgery on the morning of April 29, 2004.

Defendants[6] violated the standard of care when they did not re-consult surgery on April 28." Trial Court Opinion, 3/18/14, at 16.

We agree with the trial court that plaintiff did not introduce sufficient evidence to establish the necessary elements to maintain this cause of action for negligence. In a malpractice action, a plaintiff must demonstrate that the defendant's act or omission was an "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient[.]" *Toogood*, *supra* at 1145. Dr. Weissman's contradictory testimony regarding whether the onus was on the physician to call in, or on the hospital to notify the physician, was woefully inadequate in defining the generally accepted practice. It was tantamount to no standard of care testimony at all. Thus, Executor did not carry its burden of establishing the minimum necessary to survive a nonsuit. *Brodowski*, *supra*.

Judgment affirmed.

Judge Jenkins Joins the Memorandum.

Judge Mundy files a Dissenting Memorandum.

---

[6]  The trial court noted that the expert reports spoke in terms of multiple departures from the standard of care by several medical consultants and attending physicians, and were not tailored to the conduct of Drs. Castellano and Decker specifically. The trial court attributed "the confused and conflicting testimony offered at trial" by Dr. Weissman to that lack of specificity. Trial Court Opinion, 3/18/14, at 17 n.5. Dr. Lipsky's videotaped deposition was taken for use at trial while other physicians remained as defendants in the case. The timing explains why many of his opinions were expressed in terms of deviations by physicians generally, not Drs. Castellano and Decker specifically.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/2015