J-A10038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| WILLIAM SCHLUTH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRISHAVTAR, INC. | : | |
| | : | |
| Appellant | : | No. 2013 EDA 2019 |

Appeal from the Judgment Entered June 6, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  June Term, 2017, No. 2871

| WILLIAM SCHLUTH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRISHAVTAR, INC. | : | |
| | : | |
| Appellant | : | No. 2014 EDA 2019 |

Appeal from the Judgment Entered June 6, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  June Term, 2017, NO. 3382

BEFORE:  BOWES, J. SHOGAN, J., PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 30, 2020**

Krishavtar, Inc. (Krishavtar) and Brian Panchal and Balkrushna Panchal

(Panchal) appeal from the judgment entered against them in favor of William

Schluth (Schluth) in the Court of Common Pleas of Philadelphia County (trial

_____

[*] Retired Senior Judge assigned to the Superior Court.

court) in these related breach of contract and mortgage foreclosure actions.[1] After our thorough review, we affirm in part and vacate and remand in part for the limited purpose as explained herein.

The protracted eight-year history of this case is replete with dates, reports and correspondence. We include as much of this information here as is relevant to our consideration of the issues. We take the following background facts and procedural history from the trial court's March 13, 2019 opinion and our independent review of the record.

## I.

Schluth had owned the gasoline service station located at 6401 Torresdale Avenue, Philadelphia, Pennsylvania (the Property) for 24 years when Panchal approached him in 2008 to inquire whether the Property was for sale. (*See* N.T. Trial, 12/05/18, at 155-56). Although he had no experience in running a gas station or auto repair shop, Panchal wanted the station as part of his retirement. (*See id.* at 156-57; N.T. Trial, 12/06/18, at 90-91, 164).

### A. The 2008 Agreement

Krishavtar and Schluth, individually and trading as Bill's Service Center, entered into an Agreement of Sale on September 4, 2008 (2008 Agreement). In pertinent part, that agreement provided that Krishavtar would pay $695,000.00 for the Property, with $136,000.00 down and the balance —

_____

[1] This Court consolidated the cases *sua sponte* on August 28, 2019.

$559,000.00 — to be paid in 83 consecutive installments of $4,250.43. The interest rate was 6¾% per year. A final 84th payment would be paid on any remaining principal and accrued interest. The 2008 Agreement warranted that Schluth was not aware of any contamination of the soil in or around the Property at that time. Krishavtar was granted until September 25, 2008, to conduct due diligence of the Property, including assets and business records, and any Pennsylvania Department of Environmental Protection Agency (PADEP) testing. At the suggestion of its environmental consultant, Anthony Belfield (Belfield), Krishavtar requested that Schluth perform Phase I and Phase II environmental testing before closing on the purchase. (**See** N.T. Trial, 12/05/18, at 21, 23-25).

After Schluth arranged Phase I testing and provided the results to Krishavtar, Belfield recommended Phase II testing. At Panchal's suggestion, Schluth retained Belfield's employer, Brilliant Lewis Environmental, Inc. (Brilliant), to perform the Phase II study. Phase II testing revealed that there was contamination on the Property that would require remediation. Belfield advised the parties that he believed the remediation would take two years to complete at a cost of $50,000.00.

Under the 2008 Agreement, Krishavtar had the option to walk away from the purchase at that time. Krishavtar elected to proceed with the purchase and requested that Schluth pay for the remediation. Believing that the cost would be $50,000.00, Schluth agreed to do so.

**B. Amendment to the 2008 Agreement**

On April 9, 2009, Schluth and Krishavtar entered into an Amendment to the 2008 Agreement (Amendment), Environmental Escrow Agreement, Mortgage and Note.  Panchal signed a personal Guaranty.  (**See id.** at 162-63, 165-67).

The Amendment contained the following language pertinent to our review. Paragraph 5 of the Amendment, Selected Act 2 Cleanup Standards,[2] provided:

> Seller shall not select any remediation standard, impose any engineering or institutional controls or make any application which would require any deed restrictions and/or acknowledgements or environmental covenant being imposed on the Property or impose any other use restrictions on the Property without the express written consent of Buyer.

(Amendment, Paragraph 5).

Krishavtar's counsel recommended the inclusion of Paragraph 5 at the suggestion of Belfield, who believed, at that time, based on the Phase II report,

_____

[2] Pursuant to The Land Recycling and Environmental Remediation Standards Act, 35 P.S. §§ 6026.101-6026.908 (Act 2), there are three remediation (cleanup) standards:  Background Standard (inapplicable to gas stations), Statewide Health Standard and Site-Specific Standard.  **See** 35 P.S. §§ 6026.301.  A site meets the Statewide Health Standard when it is totally remediated, i.e., the Pennsylvania Department of Environmental Protection (DEP) finds that the contamination of the site is still present, but that it does not pose a risk to health, human welfare or the environment.  Pursuant to the Site-Specific Standard, contamination remains on the site in excess of the Statewide Health Standard, and the PADEP requires certain protections against further contamination, such as engineering and institutional controls in the form of environmental covenants. (**See** N.T. 12/05/18, at 28-29, 31-32, 76-78).

that remediation could be performed that would achieve PADEP approval based upon the Statewide Health Safety Standard of Act 2.

Paragraph 3 of the Amendment provides, in pertinent part, that Schluth was responsible for indemnifying Krishavtar for any claims arising from damages related to violations of environmental laws that occurred prior to entering the 2008 Agreement. Paragraph 17 directs:

> The indemnification obligation imposed under Section 3 herein shall terminate seven (7) years after Seller shall have received from the [PADEP] a letter approving the Act 2 Final Report or Remedial Action Completion Report submitted by Seller to demonstrate that the soil and groundwater at the Property have attained one or a combination of the cleanup standards under Act 2.

(Amendment, at Paragraph 17).

The language of Paragraph 17 providing for a combination of Act 2 standards was put in the Amendment at Belfield's suggestion because, although the ultimate goal was to achieve the Statewide Health Standard, that is not always possible or practical, and the language of Paragraph 17 would provide for alternate standards to be used to obtain PADEP approval and the necessary release of liability for Krishavtar. At the time of closing and signing of the Amendment, neither Panchal nor defense counsel advised that he would never sign an environmental covenant regardless of its provisions.

Furthermore, pursuant to the Amendment, although Krishavtar occupied the Property, Schluth was to advise of any developments with respect to the work being performed by Brilliant and copies of all correspondence between him and the PADEP.

The Environmental Escrow Agreement provided that Schluth shall take whatever action necessary to ensure that the remediation complies with all applicable laws, and that the parties would put $50,000.00 in escrow for both parties to authorize release of payment to Brilliant for work performed. Brilliant was to perform a site characterization study and undertake any necessary remediation. The Environmental Escrow Agreement also stated that Schluth would obtain a closure report from the PADEP within two years, but that if Schluth did not obtain the report within two years, only Krishavtar could authorize release of escrow funds. All notices and communications under or in connection with the Escrow Agreement would be deemed given to Krishavtar if delivered to it at the Property.

Mirroring the 2008 Agreement, the Note provided for 83 equal principal and interest payments of $4,250.43, with a final 84th balloon payment of the remaining balance plus accrued interest. The Note provided:

> As provided above, the eighty-fourth (84th) (balloon) payment is the final payment (hereinafter referred to as "final payment") under the Note. In the event [Schluth] has not received a letter from the [PADEP] approving the Act 2 Final Report or Remedial Action Completion Report submitted by [Schluth] by the date of the final payment, the Note shall be extended and final payment shall not be due until three (3) months after [Schluth] receive[s] the approval letter. Three (3) months after the approval letter is received by [Schluth], [Krishavtar] shall make the final payment. For the time-period of the eighty-third (83rd) payment until three (3) months after the approval letter is received by [Schluth], [Krishavtar] shall continue to make monthly installment payments of [$4,250.43] toward principal and interest thereon at six and three-quarters (6 3/4) percent per annum on the declining balance of principal, thereby reducing the principal balance due and final payment.

(Note, 4/09/09, at 2) (pagination provided).

- 6 -

If Krishavtar failed to make three consecutive monthly payments, after notice, the entire balance would be due. The Note expressly incorporated the Mortgage, which provided that "[a]ny forbearance by [Schluth] in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy." (Mortgage, 4/09/09, at Paragraph 10).

Panchal personally guaranteed the Mortgage, ensuring that if default occurred, he would make payment under the Note. (**See** Guaranty of Mortgage, 4/09/09, at Paragraph 1).

### C. 2009 Site Characterization Report/ Remedial Action Plan

On August 31, 2009, Brilliant submitted a Site Characterization Report/Remedial Action Plan (SCR/RAP)[3] to the PADEP. The SCR/RAP showed that the soil and groundwater contamination had extended beyond the Property's boundaries across the street to where utility lines and pipes existed, and that remediation to the Statewide Safety Health Standard would require excavation of the roadway and sidewalks, permits from Philadelphia, and the punching of holes in or around the high-pressure gas pumps while avoiding underground utilities. Because of the near impossibility of accomplishing this, the SCR/RAP identified a combination of Statewide Safety Health and Site-

_____

[3] An individual is required to submit certain reports and evaluations throughout the remediation process for the PADEP's review and approval. **See** 35 P.S. § 6026.304(l).

- 7 -

Specific Standards that allowed remediation to occur by natural attenuation instead, a plan that the PADEP could approve.

When Belfield shared the SCR/RAP with Panchal, Panchal advised that he did not want the gas station dug up because that would close it down for an extended period. Belfield specifically informed him that the anticipated environmental covenants, the prohibition of placing a potable well on the Property and requiring the impervious surface to remain intact, would impose no burden on him because they were already required by Philadelphia ordinance. Although Panchal was concerned that the environmental covenants would affect his ability to further develop the Property and refinance, Belfield assured him that the restriction would not interfere with the gas station's operations or development or Krishavtar's refinancing efforts. Panchal did not either inform Belfield or Schluth that he would not accept the environmental covenants or tell Brilliant to cease work on the Property. Had Panchal done so, Brilliant would have had to stop all remediation efforts because the site could not obtain the PADEP approval under any standard other than site-specific. (*See id.*).

On September 4, 2009, the PADEP sent a letter addressed to Schluth at the Property, then owned and occupied by Krishavtar, advising that it received the SCR/RAP and identifying the Site-Specific Standard. The letter advised that the PADEP would review the SCR/RAP within 90 days and send a review letter to the facility owner.

On October 13, 2009, the PADEP sent a letter to Schluth at his home address and copies to Belfield and Panchal, advising that the PADEP considered

the SCR late because the one previously submitted was incomplete. Upon receiving this correspondence, Panchal contacted Belfield to inquire about the status of the Property. Belfield explained that the PADEP considered the SCR late because of a dispute between the agency and Brilliant about the extent of the contamination that had been delineated on the Property. Specifically, because of "severe limitations" at the site, Brilliant had to use an alternate method to determine the extent of the contamination that the PADEP did not initially accept. Belfield again informed him that the plan was to remediate to the Site-Specific Standard, requiring environmental covenants. Although Panchal had some concerns, he did not express an unwillingness to remediate to this standard or tell Brilliant to stop its remediation work. If he had done so at that time, Brilliant would have ceased work.

### D. Continuing Site Characterization

On May 27, 2011, Belfield sent Schluth and Krishavtar a letter outlining Brilliant's intended remedial action plan, which included natural attenuation and its intent to seek the PADEP approval under the Site-Specific Standard. Belfield spoke with Panchal about the contents of the letter at his office.

The PADEP sent correspondence addressed to Schluth at the Property on April 24, 2012, again disputing Brilliant's delineation in the areas of the utilities and gas line that Brilliant believed to be extremely problematic. Belfield discussed the contents of the letter with Panchal and explained that there had been delays because of the PADEP's concerns about the extent of the contamination.

In August 2012, Brilliant submitted a Status Summary Report to the PADEP, which responded on August 22, 2012, with its concerns about the Property. On October 25, 2012, Brilliant responded to the PADEP letter, requesting a meeting at the Property to discuss the preparation of a Final Report. The letter referenced providing a summary and site-specific recommendations. Panchal, Schluth, Brilliant and the PADEP attended the meeting at the Property in which they discussed the institutional controls that would be part of the remedial action plan. At some point thereafter, Panchal claimed that he had not received Brilliant's October 25, 2012 letter and attachments. Although Belfield advised Schluth that Panchal was aware of what was going on, Schluth took a copy of the October 25, 2012 documents to him at the gas station and had Panchal sign an acknowledgment that he received them. On February 13, 2013, Panchal and Krishavtar's counsel, Eric Bolstein, Esquire, sent a letter to Schluth's attorney, Barbara Riefberg, Esquire, acknowledging his clients' receipt of the October 25, 2012 letter.

On March 11, 2013, Attorney Riefberg responded, reiterating that work needed to be completed to achieve the Site-Specific Standard and that, after Brilliant submitted all necessary data to the PADEP, an environmental covenant would be placed on the Property ensuring that whatever contamination that remained on the site would not pose a health risk so that Krishavtar could obtain a release of liability from the PADEP. Neither Panchal nor Attorney Bolstein objected to the plan delineated by Attorney Riefberg's letter, although Panchal had no intention of signing the covenant.

On July 30, 2013, Brilliant sent a report to the PADEP and provided Panchal with a copy on August 9, 2013. On January 9, 2014, Panchal sent a letter to Schluth in which he stated that he had not been regularly updated regarding site development and stated that he could hire his own environmental consultant to complete the remediation.

On January 30, 2014, Brilliant prepared a Summary Report in which it described its efforts at the Property and its communication history with the PADEP, and explained its opposition to the PADEP's request for additional delineation of soil across the street from the Property because of the utilities in the area and the high-pressure gas main. At Schluth's request, Belfield had a conversation with Panchal during the last week of January during which Belfield informed Panchal of the ongoing investigation activities at the site, all environmental activities completed to date, and all planned future activities. They also reviewed the status of correspondence with the PADEP. Belfield memorialized the conversation in a February 5, 2014 letter to Panchal. Brilliant sent Panchal a copy of the Status Report on February 11, 2014.

On February 12, 2014, Panchal sent a letter to Schluth in which he acknowledged receipt of the Summary Report, enclosed the monthly mortgage payment but contended that the cleanup was to have been completed in two years and threatened to stop making payments unless Schluth completed the characterization and remediation. Although Panchal threatened to hire his own consultant to complete the work, the letter did not complain about the use of the Site-Specific Standard or the need for an environmental covenant, even

- 11 -

though "[n]ever under any circumstances would [he] ever have signed an environmental covenant[.]"

On August 15, 2014, Brilliant sent Panchal a letter containing a comprehensive Summary Report supplied to the PADEP. In the attached letter, Brilliant advised Panchal that "no further investigation at the Site is necessary" and that it would prepare a Site Characterization Report and Remedial Action Completion Report summarizing all completed remediation activities along with "site specific recommendations." (Brilliant Letter to Panchal, 8/15/14, at 9, 10); (*see* N.T. Trial, 12/05/18, at 67-69).

On January 9, 2015, Panchal notified Schluth that he was withholding Krishavtar's mortgage payment based on the departure from the two-year completion requirement for the site cleanup until Schluth provided him with "satisfactory environmental clearances" from the PADEP. (N.T. Trial, 12/06/18, at 45; *see id.* at 44). Schluth and Panchal met to discuss a modification of the terms of the Note and Mortgage if Schluth were released from the requirement that he complete the remediation. The total principal amount would remain the same, the monthly amount payment due would be reduced to $3,022.41, and a balloon payment still would be due within three months' of receiving the PADEP approval for the Final Report or Remedial Action Completion Report.

On March 31, 2015, Attorney Riefberg sent Panchal modification documents. It provided, in relevant part:

> Substantial site testing has been performed under the direction and supervision of PADEP. You have been made aware of the progress of the project by Brilliant Environmental Services, LLP. Mr.

Schluth has continued to pay for all COSTS of the project as required by the Agreement of Sale. It is expected that the matter will be brought to a satisfactory conclusion in the near future. At no time have your business-operations been impacted nor have you suffered any financial loss.

As a gesture of goodwill and in the spirit of cooperation, Mr. Schluth is willing to do the following:

A. Amend the existing terms of the loan to a 20 year mortgage with a five (5) year balloon at a reduced interest rate of 4.75% effective as of May 2015;

B. The late fee in the original documents would be maintained.

C. The new monthly payment would be $3,101.

A condition of the terms being proposed by Mr. Schluth is that you immediately pay the February and March 2015 payments which you withheld and pay the April 2015 payment when due. Mr. Schluth will agree to waive any late fees as part of this negotiated resolution.

This proposal is being submitted solely as a compromise and is without prejudice to any positions that may be taken if this matter proceeds to litigation.

If you are agreeable to these resolutions, I will prepare new loan documents and a revised amortization schedule which will show the amount of the balloon payment.

Despite never signing the documents, Panchal unilaterally began making the lower payment the parties had discussed ($3,022.41) on May 1, 2015, with no March or April 2015 payment ever being made.

### E. The 2015 Site Characterization Report and Remedial Action Plan

On October 26, 2015, Brilliant submitted a new Site Characterization Report and a Remedial Action Plan (2015 SCR/RAP) to the PADEP. The PADEP acknowledged its receipt of the 2015 SCR/RAP in a letter addressed to Schluth

at the Property two days later. It confirmed that Brilliant would be utilizing the Site-Specific Standard and that, after the PADEP approved the Remedial Action Completion Report, the PADEP approval would be necessary for the language of the required environmental covenant. Belfield discussed the 2015 SCR/RAP with Panchal and confirmed that its contents were consistent with the project's scope since the beginning. Belfield told Panchal that the proposed environmental covenants were the same as those proposed in August 2009: prohibition on the installation of a potable well and continuous maintenance of impervious ground cover. These covenants did not require any testing of the groundwater or soil. He again explained that both of these restrictions already are mandated by the city of Philadelphia because the city prohibits the installation of potable wells within its boundaries and, to meet the maintenance requirements to operate a gas station, there has to be an impervious cover. (*See* N.T. Trial, 12/05/18, at 62-65, 67, 70-71, 121).

On January 13, 2016, Brilliant prepared an addendum to the 2015 SCR/RAP to address comments made by the PADEP in December 2015. Copies of the addendum were sent to both parties' counsel. On January 22, 2016, the PADEP advised Schluth, Panchal and Krishavtar that it approved the 2015 SCR/RAP, which included Brilliant's selection of both the Statewide Health and Site-Specific Standards.

On March 4, 2016, Belfield sent Attorney Bolstein copies of the PADEP's acknowledgement of its receipt of the 2015 SCR/RAP and its January 22, 2016 approval letter. (*See* N.T. Trial, 12/06/18, at 217-18).

- 14 -

**F. The 2016 Remedial Action Completion Report**

Upon Belfield's departure from Brilliant, Tim Norris (Norris) took over as project manager for the Property. Norris spoke to Panchal about the project and advised him of the contents of the Remedial Action Completion Report (RACR), i.e., the combination standard and the need for environmental covenants. (**See** N.T. Trial, 12/05/18, at 124, 126, 134). Panchal did not oppose the RACR's submission and did not advise Norris, Brilliant or Schluth that he would refuse to sign the environmental covenant. If Panchal had insisted that Brilliant remediate to the Statewide Health Standard, Norris would have removed himself from the case. (**See id.** at 134-35). On October 26, 2016, Brilliant submitted the RACR to the PADEP.

The PADEP notified Schluth on January 19, 2017, that it was approving the RACR, that remediation of the Property met a combination of the Statewide Health and Site-Specific Standards for soil and groundwater, that there would be a release of liability, that the environmental covenants should be submitted to the PADEP within 30 days for approval, and that anyone aggrieved by the action had the right to file an objection. Schluth delivered a copy of the RACR and the DEP's January 2017 letter to Panchal on February 17, 2017.

On March 2, 2017, Norris sent Panchal a copy of the Environmental Covenant that was approved by the PADEP. Brilliant and Schluth did not receive any further communication from Panchal and he refused to sign the Environmental Covenant, even though it was precisely the one Belfield told him about in August 2009. Norris confirmed that the Environmental Covenant was

consistent with the covenant that was anticipated from the beginning when it became clear in autumn 2009 that a combination standard would need to be used.

The final payment Panchal made on the Mortgage and Note was on February 9, 2017. On June 22, 2017, Schluth's counsel sent a letter to Panchal/Krishavtar putting them on notice that pursuant to the Note and Mortgage, they were in default because the balloon payment had come due without payment. Krishavtar did not exercise its right to reinstate under Paragraph 17 of the Mortgage, and Panchal, as guarantor, did not make the payments necessary to reinstate the Mortgage.

## II.

On June 26, 2017, Schluth commenced a breach of contract action against Panchal and Krishavtar at docket number 2017-2871. Specifically, his July 28, 2017 Amended Complaint claimed: Count I: Breach of Contract against Krishavtar for failure to make payments under the Note; Count II: Breach of Contract against Panchal for his failure to make payments under the Guaranty; Count III: Breach of Contract against Krishavtar for breaching its duty of good faith and good dealing under the Amendment for failing to sign the Environmental Covenant where it did so unreasonably; Count IV: Declaratory Judgment and Injunctive Relief seeking to have the Court order Krishavtar sign the Environmental Covenant. (*See* Amended Complaint, at 4-8). On June 29, 2017, Schluth filed an action in mortgage foreclosure against Krishavtar at

docket number 2017-3382 for its failure to make the balloon payment after receipt of the January 19, 2017 PADEP approval letter.[4]

Schluth claimed damages in the amount of $556,002.96 (principal balance of $453,211.26; late charges on mortgage payments not made or not fully made in the amount of $1,988.36; late fee for non-payment of balloon payment of $22,660.56; interest for 662 days through December 5, 2018, at per diem of $83.81 for a total of $55,482.22; legal fees of $22,660.56). (*See* N.T. Trial, 12/05/18, at 197-200).

In response, Panchal and Krishavtar counterclaimed that: Count I: Schluth breached the Agreement by failing to timely provide them with documentation and correspondence from the PADEP relative to the remediation and in electing a remediation standard that required an environmental covenant without Krishavtar's express written consent; Count II: Breach of the Environmental Escrow Agreement for failing to complete remediation within two years; Count III: Declaratory Judgment that the balloon payment is not due because of Schluth's breaches. (*See* Counterclaim, at 20-24).

After a December 6-8, 2018 bench trial, the trial court found in favor of Schluth on his claims of breach of contract and mortgage foreclosure and denied his request for declaratory relief/injunction as moot. Specifically, the court found

_____

[4] The certified record provided to this Court does not contain the Mortgage Foreclosure action. We rely on Krishavtar's description. (*See* Krishavtar's Brief, at 21).

- 17 -

that the PADEP's February 17, 2017 approval letter triggered the balloon payment under the Note and that Krishavtar failed to pay it, thus breaching the terms of the Mortgage and Note; that Panchal's failure to make the balloon payment on the Note and Mortgage or to make three consecutive monthly payments constituted a breach of the Guaranty; that Krishavtar breached the duty of good faith and fair dealing when it kept its true intent hidden and failed to sign the Environmental Covenant since it imposed no burden, and there was no reasonable basis to deny consent.

The trial court also granted mortgage foreclosure in the amount of $555,942.96. The court denied Panchal and Krishavtar's Counterclaims, concluding that Schluth did not materially breach Paragraph 5 the Amendment by failing to obtain Krishavtar's express written consent to a remediation standard before he submitted the 2015 SCR/RAP. The court found the result was clearly foreseeable and that Panchal and Krishavtar, having been advised of this probable result, allowed work to continue despite the likely requirement of an environmental covenant that placed no restriction on the use of the Property. The court further found that Panchal's refusal to give approval was merely a pretext to avoid making the final balloon payment. (**See** Trial Court Opinion, 3/13/19, at 15-20).

Krishavtar timely appealed[5] and it and the court complied with Rule 1925. **See** Pa.R.A.P. 1925.

## III.

## A. Material Breach Excusing Performance

Krishavtar first argues that the court erred by failing to excuse its performance based on Schluth's material breach of the Amendment by failing to obtain its express written consent to the remediation standard pursuant to Paragraph 5. (**See** Krishavtar's Brief, at 23-29). Schluth counters that, although Krishavtar had the right to reject any standard that imposed deed restrictions, Schluth's violation of Paragraph 5 was immaterial where Krishavtar was aware of the environmental covenant since August 2009. (**See** Schluth's Brief, at 22-25).

_____

[5] Our standard of review of this matter is well-settled.

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. We will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence.

**_J.J. DeLuca Co., Inc. v. Toll Naval Assoc._**, 56 A.3d 402, 410 (Pa. Super. 2012) (citations and quotation marks omitted).

**1. Breach of Contract**

It is long settled that to establish an action in breach of contract, a party must prove (1) the existence of a contract and its essential terms, (2) a breach thereof, and (3) resulting damages. ***See Hart v. Arnold***, 884 A.2d 316, 332 (Pa. Super. 2005), *appeal denied*, 897 A.2d 458 (Pa. 2006).

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

***Id.*** (citation omitted).

Pursuant to Paragraph 5 of the Amendment:

> [Schluth] shall not select any remediation standard, impose any engineering or institutional controls or make any application which would require any deed restrictions and/or acknowledgements or environmental covenants being on the Property or impose any other use restrictions on the Property without the express written consent of [Krishavtar].

(Amendment, Paragraph 5).

The intent of the parties reflected in this unambiguous language is that Schluth could not select a remediation standard or make any applications that would require environmental covenants without Krishavtar's express written consent. ***See Arnold***, ***supra*** at 332. Over a period of approximately eight years, Schluth (Brilliant) submitted the 2009 SCR/RAP, 2014 Status Summary Report, 2015 SCR/RAP, 2016 Addendum to the 2015 SCR/RAP, and the 2016

RACR to the PADEP, each of which identified the Site-Specific Standard as the standard that would be used, without allowing Panchal (Krishavtar) to review the submissions first, let alone provide express written consent to the selected standard, which necessarily required environmental covenants. Therefore, Schluth breached Paragraph 5 of the Amendment.

However, our analysis does not end there because we must determine whether this breach was material.

## 2. Material Breach

As observed by Krishavtar, "[a] party [] may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." ***Ott v. Buehler Lumber Co.***, 541 A.2d 1143, 1145 (Pa. Super. 1988) (citation omitted) (***see*** Krishavtar's Brief, at 23). In other words, a material breach by a contracting party relieves the other party of its duty of performance. ***See Widmer Engineering, Inc. v. Dufalla***, 837 A.2d 459, 467 (Pa. Super. 2003), *appeal denied*, 852 A.2d 313 (Pa. 2004). However, if a breach is immaterial, the non-breaching party does not have the right to suspend performance of its contractual duties. When considering whether a breach was material, we consider the following factors pursuant to the Restatement (Second) of Contracts:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

- 21 -

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts, § 241 (1981).

Here, the trial court found that "Schluth did not **materially** breach Paragraph 5 of the Amendment when he submitted the 2015 SCR/RAP which reflected the station would be remediated to the Site-Specific Standard and would require an environmental covenant." (Trial Ct. Op., at 16). Considering the above five factors, we agree.

**a. Deprived of Reasonably Expected Benefit**

First, Krishavtar will not be deprived of a benefit that it **reasonably** expected because Schluth chose the remediation standard without obtaining its express written consent. The benefit Krishavtar wanted was that the Property be sold to it free of hazardous materials and without any environmental covenants or deed restrictions that would restrict its use of the Property.

Schluth and Belfield repeatedly advised Krishavtar throughout the remediation process. Since August 2009, Krishavtar was told that based on the results of the Phase II environmental testing, remediation would be required and an environmental covenant would likely be imposed. Moreover, Krishavtar was repeatedly advised that the required environmental covenant would place no

further restriction than that imposed on any other gas station in the city of Philadelphia, which required any gas station not to install a well for potable water as well as to maintain an impervious surface. It was not reasonable then for Krishavtar to expect that the Property would be remediated to anything other than the Site-Specific Standard with no environmental covenants required. Moreover, this environmental covenant did not impose any burden on Krishavtar because the same requirements are placed on all gas stations in the city of Philadelphia. Importantly, when informed that a covenant would be necessary, Krishavtar had the option to cancel the Agreement pursuant to Article X of the Agreement, but it failed to do so. Given all that, Krishavtar could not have reasonably expected to obtain the Property without any environmental covenant.

Accordingly, Schluth's failure to obtain Krishavtar's express written consent to the Site-Specific Standard did not deprive it of any benefit it reasonably expected.

### b. Adequate Compensation for Deprived Benefit

There is no part of the benefit of which Krishavtar will be deprived of by the utilization of the Site-Specific Standard without getting its written consent first. The Property was not going to be remediated to obtain the PADEP approval under any other standard. Further, the same burden (no potable water and maintenance of an impervious surface) would be applicable regardless of the remediation standard utilized because it is placed on all gas stations in the city of Philadelphia.

This factor weighs in favor of a finding that Schluth's breach was not material.

### c. Forfeiture

This factor is not relevant to our review.

### d. Likelihood of Curing Failure

It is impossible for Schluth to cure the failure to obtain Krishavtar's express written consent to the documents already submitted to the PADEP because the remediation process has been completed and approved by the PADEP at this time. Krishavtar is receiving the benefit it could have reasonably expected — the Property has been approved by the PADEP and it is not subject to any restrictions that are not applicable to all gas stations within the city of Philadelphia.

### e. Schluth's Good Faith Performance

Finally, Schluth acted in good faith, although he failed to get express written consent because he consistently kept Krishavtar apprised of the necessity of the covenant since the beginning of the project and was completely unaware that Krishavtar would not sign an environmental covenant under any circumstances. Further, he expended a substantial sum of money to ensure that Krishavtar would receive a remediated Property that complied with Act 2 remediation standards.

Based on the foregoing, we agree with the trial court that Schluth did not materially breach the contract by failing to procure Krishavtar's express written consent to the combination of the Site-Specific and State Health Standards of

remediation pursuant to Paragraph 5 of the Amendment. Thus, Krishavtar's performance was not excused.[6]

_____

[6] Neither are we persuaded by Krishavtar's argument that in finding that the trial court improperly allowed Schluth to select the method of remediation. (***See*** Krishavtar's Brief, at 24-25). Krishavtar points out that Schluth "blindly relied on Brilliant to remediate the property" without consideration of the contract, and that, when Belfield advised him to check the contract to be sure the 2015 SCR/RAP was in compliance, he did not do so. (***See id.***). However, it is unclear how these examples support a claim that the trial court impermissibly shifted the burden of selecting the remediation standard to him.

Further, Krishavtar maintains that it was not clearly foreseeable that the Property would need to be remediated to a Site-Specific Standard because Brilliant and the PADEP were in discussions over the extent of the contamination for nearly eight years. (***See id.*** at 25). However, over those years, Brilliant (through Belfield) continually told Krishavtar, and submitting applications and documentation to the PADEP that whatever the final delineation of the contamination and a final determination of the best way to remediate it, a Site-Specific Standard would be used. Therefore, it was clearly foreseeable and Krishavtar could not have reasonably expected anything else.

Finally, we are not legally persuaded by Krishavtar's claim that the trial court ruled contrary to contract law when it found that Krishavtar violated its duty of good faith and fair dealing because the contract language did not require that its decision to withhold consent (by not signing the Environmental Covenant) be reasonable. (***See id.*** at 27-28). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." ***Donahue v. Federal Express Corp.***, 753 A.2d 238, 242 (Pa. Super. 2000) (citing Restatement (Second) of Contracts § 205 (1981)). This duty varies depending on the context, but "certain strains of bad faith [] include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." ***Somers v. Somers***, 613 A.2d 1211, 1213 (Pa. Super. 1992). Here, the trial court found that Krishavtar's secret intent not to accept any deed restrictions no matter what and its real motivation of not having to pay the final balloon payment fell into this category. We cannot find that the trial court's weighing of the evidence and credibility determination on this matter was "manifestly erroneous, arbitrary, capricious or contrary to the evidence" or that it was an error of law. This argument fails.

**B. Recission**

Krishavtar next argues that the trial court erred by failing to apply Paragraph 14 of the Amendment to allow for rescission of the contract. (**See** Krishavtar's Brief, at 29-31). It maintains that, "the [c]ourt refused to consider that because the Station could not be remediated to a standard approved by Krishavtar, it could [not] be remediated consistent with the 2008 Agreement [] and the Amendment, so that the contract should be rescinded altogether." (**Id.** at 29); (**see id.** at 31) ("[I]t is clear that the site could not be remediated consistent with the parties' intent as expressed in the Amendment [and] the lower court erred by failing to find that the entire transaction should be rescinded and the parties restored to the status quo.").

Krishavtar maintains that the Property would have only been "totally remedied" under the Statewide Health Standard. (**Id.** at 30) (quoting N.T. Trial, 12/05/18, at 77).[7] It points out that under the Site-Specific Standard, contamination is left on a property after remediation and environmental covenants are required to protect against further contamination. (**See id.** at 30). Therefore, argues Krishavtar, by using the Site-Specific Standard, the

---

[7] Krishavtar also argues that Brilliant's determination that remediation under the Statewide Health Standard was impossible to achieve "stripped" it of its ability to dictate the extent of the remediation under Paragraph 5 of the Amendment. (**See id.** at 31); (N.T. Trial, 12/05/18, at 112). We addressed Krishavtar's argument regarding Paragraph 5 in the first issue and decline to revisit it here.

Property would not be "totally remediated," thus violating Paragraph 14 of the Amendment. (*Id.* at 31).

Schluth responds that the Property was remediated to the approval of the PADEP as contemplated by the language of Paragraph 17 of the Amendment that the Property be remediated by attaining "one or a combination of the cleanup standards under Act 2." (Schluth's Brief, at 26) (quoting Paragraph 17 of the Amendment). Therefore, he argues, because the Property was remedied as contemplated by the Amendment, Krishavtar cannot invoke the rescission provision at Paragraph 14. He also argues that even if remediation were impossible, rescission would be inappropriate where the parties could not be restored to their status as it existed at the time of sale because Krishavtar had so ineffectively run what was a successful gas station at the time of sale that it had been closed for months by the time of trial. (*See id.* at 25).

Paragraphs 14 and 17 of the Amendment provide, in pertinent part:

14. Seller and Buyer agree that if the site cannot be remedied of the Hazardous Materials, Seller shall return to Buyer all monies paid by Buyer to Seller . . . and Buyer shall execute a deed transferring the real property to Seller. This provision shall survive closing.

* * *

17. The indemnification obligation imposed under Section 3 herein shall terminate seven (7) years after Seller shall have received from the [PADEP] a letter approving the Act 2 Final Report or Remedial Action Completion Report submitted by Seller to demonstrate that the soil and groundwater at the Property have attained one or a combination of the cleanup standards under Act 2.

(Amendment, at Paragraphs 14, 17).

- 27 -

The trial court found as fact that Paragraph 17 provides for a combination of Act 2 cleanup standards if they are required to obtain the PADEP approval and that, at the time the parties were negotiating the Amendment, Belfield was aware that remediating the Property might require a combination of the Statewide Health and Site-Specific Standards and repeatedly advised Krishavtar of same. (*See* Trial Ct. Op., at 5-6) (citing N.T. Trial, 12/05/18, at 30-31).

The court did not expressly consider the impact of Paragraph 14 on Krishavtar's right to rescind the contract. However, the language of the paragraph does not contain the qualifier "totally" and nowhere in the documents is "remedied" so qualified. In fact, applying the use of plain language, the Property was "remedied" of hazardous materials under a combination of the State Health and Site-Specific Standards as contemplated by Paragraph 17.

Accordingly, although the trial court did not expressly address Paragraph 14, we conclude that it properly found that Schluth remedied the Property when he obtained approval from the PADEP and, therefore, denied Krishavtar's request for rescission of the contract. This issue lacks merit.

### C. Damages

In its third argument, Krishavtar maintains that the court erred in calculating damages because it failed to consider the parties' modification of the payment terms. It argues that in March 2015, the parties discussed modification of the mortgage payments and that Schluth assured Panchal that new documents would be prepared but that, in the meantime, he should pay $3,022.41 each month, which he did from March 9, 2015, through February 9,

2017, with a note that he was awaiting the revised mortgage documents and the payments were being made pursuant to the refinancing. Krishavtar argues that Schluth's conduct in accepting the reduced payments for nearly two years belies any suggestion that Krishavtar opposed the modification.

Schluth argues that his receipt and deposit of the monthly mortgage payments does not constitute an oral modification or modification by course of conduct and that he repeatedly complained of the short payment. He maintains that the Note expressly precludes oral modification of its terms and the Mortgage provides that: modification of its terms must be in writing and signed by all parties and that his forbearance in exercising any right or remedy does not waive his right to exercise the right or remedy. (Note, at 2); (Mortgage, at Paragraphs 10, 25). Finally, he argues that he supplied Krishavtar with proposed revised documents that Krishavtar refused to sign.

It is long established that a contract not for the sale of goods may be modified orally by agreement of the parties, even if the contract provides that such modifications must be in writing. *See Brinich v. Jencka*, 757 A.2d 388, 399 (Pa. Super. 2000). However, the parties' conduct must clearly show the intent to make the amendment, and the party advancing such modification must prove it by "clear, precise and convincing evidence." *Id.* (citation omitted). Whether the parties' conduct evidenced the intent to orally modify a written contract is a question of fact to be determined by the fact-finder. *See Accu-Weather, Inc. v. Prospect Communication, Inc.*, 644 A.2d 1251, 1255 (Pa. Super. 1994).

In this case, the trial court found that after a March 2015 discussion between Panchal and Schluth about modifying the terms of the Note and Mortgage, Schluth's counsel sent Panchal proposed modification documents reflecting a lower interest rate of 4.75% and lower monthly payments. Despite not signing the documents, Krishavtar began making the lower payments in May 2015 and never paid the Mortgage for March or April 2015. Schluth accepted all 21 of the payments.

However, despite Krishavtar arguing in its Post-Trial Motion that the court erred in determining damages because it failed to find that the parties had modified the terms of the Note and Mortgage orally and by their conduct, the trial court failed to address this issue. (*See* Krishavtar and Panchal's Post-Trial Motion, 3/25/19, at 11-12) (pagination provided); (Trial Court Order, 5/07/19, at 1 n.1); (Trial Ct. Op., at 3-20).

Therefore, because this is a finding for the trial court as fact-finder, *see Prospect Communication, Inc.*, *supra* at 1255, we are constrained to vacate the damage award and remand for the limited purpose of the court to make factual findings whether the parties modified the payment terms under the Note and Mortgage and enter an amount of damages consistent with those findings.[8]

Judgment affirmed in part and vacated in part. Case remanded consistent with this decision. Jurisdiction relinquished.

_____

[8] Although the modification would not affect the total principal due, it would affect the interest rate to be applied (6¾% under original note, 4.75% under the modification).

- 30 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/30/20